731 A.2d 485

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHARLES APPRENDI, JR., DEFENDANT–
APPELLANT.

Argued October 13, 1998—Decided June 24, 1999.

*Joseph D. O'Neill,* argued the cause for appellant (*Mr. O'Neill,* attorney; *Mr. O'Neill* and *Charles I. Coant,* on the brief).

*Jacqueline E. Turner,* Assistant Deputy Public Defender, argued the cause for *amicus curiae,* Office of the Public Defender (*Ivelisse Torres,* Public Defender, attorney).

*Lisa Sarnoff Gochman,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

O'HERN, J.

An issue that is surfacing with increasing frequency in criminal cases is whether a given portion of a statute constitutes an element of an offense or, instead, is a sentencing provision. The answer determines whether the factual determinations for which the provision calls are to be made by the fact-finder or the sentencer, and whether the reasonable doubt standard of proof must be applied.

[67 *U.S.L.W.* 3289, Vol. 67, No. 16 (Nov. 3, 1998).]

This appeal presents such a question. The case concerns the constitutionality of one provision of New Jersey's hate crime laws. With certain exceptions, the provision allows enhanced sentencing in any case in which "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." *N.J.S.A.* 2C:44-3(e). (For convenience we may sometimes refer to such a purpose as a "biased purpose.") The constitutional question is whether a jury must find that purpose to have existed beyond a reasonable doubt before a court may impose an extended sentence for a hate crime. We find that the provision has been narrowly tailored to meet First Amendment concerns, and represents a legislative attempt to comply with a constitutional mandate, not a legislative attempt to circumvent due process rights to trial by jury. We affirm the judgment of the Appellate Division upholding defendant's extended sentence for a bias crime.

I

Early on the morning of December 22, 1994, police arrested defendant at his home in Vineland for the shooting of a neighbors'

home. The neighbors were a black family living in an all-white neighborhood. This was the fourth time that the neighbors' home had been fired upon. On September 24, 1994, a single bullet pierced their window, and twice in November 1994, bullets struck the exterior of the home. After the December 22 shooting, one of the neighbors recognized defendant's grey Chevrolet truck driving away. The police were called.

The police arrived approximately twenty minutes later and arrested defendant at his home. Acting on a later-acquired search warrant, police found various weapons at defendant's home, including a .22–caliber rifle, with laser sights and a silencer attached, and an anti-personnel bomb. During the police questioning, defendant admitted that he had fired four or five rifle shots into the home. Defendant gave a later statement in which he admitted that although "he does not know the . . . victims or the family, but because they are black in color he does not want them in the neighborhood. . . ." He said that he was "just giving them a message that they were in his neighborhood."

A Cumberland County grand jury returned a twenty-two-count indictment against defendant. It included charges of possession of a firearm for an unlawful purpose, possession of a prohibited weapon, attempted murder, attempted aggravated assault, harassment, and possession of a destructive device.

Defendant negotiated a plea agreement under which he pled guilty to three of the counts. Two counts included the second-degree crimes of possessing a firearm for an unlawful purpose on September 24 and December 22, 1994. The third involved unlawful possession of a prohibited weapon, an anti-personnel bomb. Under the terms of the plea, any sentence imposed on the prohibited weapon count was to be concurrent with the sentences to be imposed on the two unlawful purpose counts. The plea agreement left the determination of the sentence on these two counts to the discretion of the court. In addition, the State reserved the right to make an application under the hate crimes law for imposition of an extended sentence on one count of the

indictment. Possession of a weapon for an unlawful purpose is a second-degree crime for which the ordinary term is between five and ten years. If approved, an extended term on one of those counts exposed Apprendi to a maximum penalty of twenty years' imprisonment with ten years of parole ineligibility. When the weapon possessed is a firearm, the Graves Act requires the imposition of a minimum term of imprisonment of at least one-third of the sentence imposed or three years, whichever is greater. *N.J.S.A.* 2C:43–6(c). As part of his plea agreement, Apprendi reserved the right to contest the constitutionality of *N.J.S.A.* 2C:44–3(e), the hate-crime sentence enhancer.

At a hearing prior to sentencing, defendant offered the testimony of a psychologist who had evaluated defendant's mental state in order to establish the motive underlying the crimes. The witness shed light on certain psychological abnormalities of defendant. His condition did not rise to a level sufficient to establish a diminished capacity or insanity defense under *N.J.S.A.* 2C:4–1. The psychologist diagnosed defendant as having an obsessive-compulsive disorder, a cyclothymic disorder (a type of temperament alternating moods of elation and depression), kleptomania (a tendency to steal), drug dependence, and alcohol abuse. Additionally, the psychologist concluded that although the defendant knew that he was discharging the weapon toward the house and that it was wrong to do so, "his judgment and impulse control were substantially impaired at the time of the accident." Following that hearing, the State moved on September 5, 1995 for an extended term of imprisonment pursuant to *N.J.S.A.* 2C:44–3(e). After consideration of the testimony taken at the hearing, the trial court rejected the psychological defense, and concluded that defendant's actions were the product of racial bias thereby satisfying the statute. The court sentenced Apprendi on one of the unlawful-purpose counts to an extended term of twelve years' imprisonment with four years of parole ineligibility. Because this was Apprendi's first offense, the court made the lesser sentences on the other counts concurrent with the extended term. Other fines and penalties were imposed.

On appeal, Apprendi charged that he had been sentenced under an unconstitutionally vague law in that it permitted a court to sentence defendant to an extended term of imprisonment on so vague a basis as that the crime had been committed "at least in part with ill will, hatred or bias toward the victim." He further argued that the statute unconstitutionally allows imposition of an extended term of imprisonment based on proof of the biased purpose by a preponderance of the evidence rather than proof found by a jury beyond a reasonable doubt. A majority of the Appellate Division dismissed the vagueness challenge because in 1995, before the date of Apprendi's sentence, the Legislature had already deleted the words, "at least in part with ill will, hatred or bias toward the victim." 304 *N.J.Super.* 147, 152, 698 *A.*2d 1265 (App.Div.1997). The 1995 amendment excising the words was in response to this Court's decision in *State v. Mortimer*, 135 *N.J.* 517, 641 *A.*2d 257, *cert. denied*, 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994), holding that the same language in *N.J.S.A.* 2C:33–4(d) (a provision of our hate-crime laws addressing harassment), was unconstitutionally vague. The Appellate Division majority found that the use of the preponderance of the evidence standard to mandate an extended term did not violate the constitutional requirement that the State must prove each element of a crime beyond a reasonable doubt. 304 *N.J.Super.* at 153, 698 *A.*2d 1265. The panel found that the Legislature had not made racial bias an element of the crime charged because the provision was included in a section of the Criminal Code entitled "authority of court in sentencing." *Ibid.* The majority reasoned that "[a]s to sentencing factors which are not elements of a crime, the State's burden of proof is not subject to the reasonable doubt standard." *Ibid.* It compared this sentencing provision to that of Graves Act sentencing under which the State need not prove beyond a reasonable doubt that the actor possessed a firearm during the commission of a crime as a predicate to the imposition of a Graves Act sentence of mandatory parole ineligibility. *Id.* at 155, 698 *A.*2d 1265. One judge dissented. She found that the federal and State

constitutions require that a jury decide each element of a crime beyond a reasonable doubt and that the

> "purpose to intimidate ... because of race, [or] color" is an element of the crime when that purpose raises the sentence for the crime.... The State's power to define away the elements of the crime cannot extend, as the majority holds, to defining away the actor's culpable purpose [when it served to enhance his sentencing.]
>
> [*Id.* at 162, 698 *A.*2d 1265.]

Defendant appealed as of right under *Rule* 2:2–1(a)(2) on the basis of the dissent below.

## II

### A.

In order to understand this case, it is necessary to understand its background. On May 13, 1991, Steven Vawter and David Kerns spray-painted a Nazi swastika and words that seemed to spell "Hitler rules," on a synagogue in Rumson, New Jersey. On the same day, they spray-painted a satanic legend on the driveway of a nearby Roman Catholic church. The police charged Vawter and Kerns with violations of sections 10 and 11 of New Jersey's hate crime statute. *N.J.S.A.* 2C:33–10 and –11 forbade assaultive intimidation by the use of hateful symbols such as a swastika and the placement of such symbols on places of religious worship.

On August 23, 1991, David Mortimer and two juveniles spray-painted hate-filled words on the garage door of a Pakistani family's home in East Brunswick, New Jersey. Police charged Mortimer with two counts of ethnic harassment under *N.J.S.A.* 2C:33–4(d), which forbade harassment by offensive communications and made the offense a fourth-degree crime if one acted in part with ill will, hatred or bias and with a purpose to intimidate because of race, color, religion, sexual orientation or gender. These two 1991 cases, *Vawter* and *Mortimer*, were the first major challenges to New Jersey's hate crime laws. *State v. Vawter*, 136 *N.J.* 56, 642 *A.*2d 349 (1994); *State v. Mortimer*, 135 *N.J.* 517, 641 *A.*2d 257 (1994), *cert. denied*, 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994).

States began to enact laws to counter the evil of hate crimes in the 1980s.

> Today nearly every state, using varied approaches, has enacted legislation to punish acts of bias-motivated crime. Some states created new crimes of bias-motivated violence or intimidation. Others created new crimes that consist of the bias-motivated commission of a crime that already exists in [a] statute. Other states provided for enhanced penalties where commission of a crime was motivated by bias, or chose to treat the actor's bias motivation as an aggravating circumstance in sentencing.
>
> [Camilla Nelson, *Hate Crime on the Internet,* 1997 *SPG NAAG Civ. Rts. Update* 1, 2 (1997).]

New Jersey was one of the first states to adopt an anti-hate crime law, *L.* 1981, *c.* 282. In generic terms, the 1981 law outlawed the burning of crosses or placing of swastikas on public or private property with a purpose to terrorize others by threats of violence (Section 10) and outlawed the placing of such graffiti on houses of worship or cemeteries (Section 11).

In 1990, the Legislature expanded the coverage of our hate crime laws by enacting the "Ethnic Intimidation Act," *L.* 1990, *c.* 87. That law (1) made the disorderly persons offense of simple assault a crime of the fourth degree if the actor had a biased purpose in selecting the victim, *N.J.S.A.* 2C:12–1e; (2) made the petty disorderly persons offense of harassment a crime of the fourth degree if the actor had a biased purpose in selecting the victim, *N.J.S.A.* 2C:33–4d; and (3) added a provision allowing an extended term of imprisonment for other crimes of the first, second or third degree, *N.J.S.A.* 2C:44–3(e).

For convenience, we refer in this opinion to the several provisions of our hate-crime statute as Section 4d, Sections 10 and 11, Section 12e, and Section 44–3(e).

In signing the legislation, Governor Florio stated:

> From now on, the law in New Jersey will be intolerant of ethnic intimidation. Those who commit these crimes of hate are going to face additional charges. From now on, hate crimes will be serious crimes, whether it's a phone call in the middle of the night or vandalism that leaves hateful symbols in its wake or racial slurs.
>
> [Wisam Ali, *Florio extends term for 'crimes of hate',* Home News, Aug. 10, 1990.]

That law was similar to a model hate crime statute recommended by the Anti–Defamation League of B'nai B'rith (ADL). The model was "intended to assist state and local governments which would like to enact hate crime laws." Terry A. Maroney, *The Struggle Against Hate Crime: Movement at a Crossroads,* 73 *N.Y.U.L.Rev.* 564, 589 (1998). The ADL recommended that there be "a separate substantive crime for institutional vandalism, [and a] penalty enhancement for crimes motivated by certain biases." *Id.* at 589–90. The model statute provides, in pertinent part, "that a person is guilty of intimidation when he or she violates specified preexisting criminal laws . . . by reason of the actual or perceived race, color, religion, national origin, or sexual orientation of the victim." *Id.* at 589 n. 146.

### B.

While *Vawter* and *Mortimer* were pending, two other cases were working their way through the courts of other states. In one case, white teenagers had burned a cross on the fenced-in yard of a black family in St. Paul, Minnesota. *R.A.V. v. City of St. Paul,* 505 *U.S.* 377, 112 *S.Ct.* 2538, 120 *L.Ed.*2d 305 (1992). Convicted under St. Paul's hate crime ordinance, the youths appealed to the United States Supreme Court. In *R.A.V., supra,* 505 *U.S.* at 384–85, 112 *S.Ct.* at 2543–44, 120 *L.Ed.*2d at 318–19, the Supreme Court held that when a state regulates unprotected expression (fighting words), it cannot discriminate on the basis of content or viewpoint. Under that rationale, a state may prohibit the expression of fighting words (threats, harassment, etc . . . ) but if a state attempts to prohibit only those fighting words that contain racist hate speech, the regulation will be subject to strict scrutiny and may be found to be under-inclusive.

States breathed a collective "sigh of relief" when some of the constitutional concerns regarding hate crime statutes were alleviated by the Court's decision one term later in *Wisconsin v. Mitchell,* 508 *U.S.* 476, 113 *S.Ct.* 2194, 124 *L.Ed.*2d 436 (1993). George G. Size & Glenn R. Britten, *Is There Hate Speech?: R.A.V. and Mitchell in the Context of First Amendment Jurispru-*

*dence,* 21 *Ohio N.U.L.Rev.* 913, 913 (1995). In that case a group of black youths, including Mitchell, pointed out a white boy on the street, beat him until he was unconscious, and then stole his tennis shoes. *Mitchell, supra,* 508 *U.S.* at 480, 113 *S.Ct.* at 2196–97, 124 *L.Ed.*2d at 442. The Supreme Court in *Mitchell, supra,* held that the First Amendment does not prohibit a state from providing enhanced punishment for a crime based on the actor's discriminatory purpose in committing the crime. *Id.* at 486, 113 *S.Ct.* at 2200, 124 *L.Ed.*2d at 445–46 (citing *Dawson v. Delaware,* 503 *U.S.* 159, 165, 112 *S.Ct.* 1093, 1097, 117. *L.Ed.*2d 309, 317 (1992)). Whereas the invalidated St. Paul ordinance in *R.A.V.* was expressly directed at expression, *Mitchell* explained that "[the sentence enhancer] in this case is aimed at conduct unprotected by the First Amendment." *Id.* at 487, 113 *S.Ct.* at 2201, 124 *L.Ed.*2d at 447.

It is not perfectly clear however, in what sense the hate crime sentence enhancer upheld in *Mitchell* was directed at conduct, whereas the St. Paul ordinance struck down in *R.A.V.* was directed at speech. Alan E. Brownstein, *Rules of Engagement for Cultural Wars: Regulating Conduct, Unprotected Speech, and Protected Expression in Anti–Abortion Protests,* 29 *U.C. Davis L.Rev.* 553, 560 (1996). Both ordinances appeared to have been "directed at bias-motivated behavior." *Id.* at 560. A more cynical view may be that the Supreme Court "shrugged off" without making a "full retreat" from the position that it had taken in *R.A.V.* Robert R. Riggs, *Punishing the Politically Incorrect Offender Through "Bias Motive" Enhancements: Compelling Necessity or First Amendment Folly?,* 21 *Ohio N.U.L.Rev.* 945, 950 (1995). "Ultimately, stare decisis leaves ... no alternative but to follow the complex footsteps of *Vawter* and *R.A.V.*" Lorri R. Forter, *The Role of Precedent in Hate Crime Decisions,* 5 *Temp. Pol. & Civ. Rights L.Rev.* 243, 253 (1996).

## C.

Consistent with the principles of the two cases, our Court has struck down the features of the New Jersey hate-crime law that

fall within the pattern of *R.A.V.* as being directed at speech or expression. Conversely, our Court has upheld the features of the law that fall within the pattern of *Wisconsin v. Mitchell* as being penalty-enhancers.

In *Vawter*, Vawter and Kerns had been charged under Sections 10 and 11 of the 1981 law. The Court found that those Sections represented content-based restrictions that were unconstitutional because they punished only threats or displays of graffiti expressive of certain beliefs, not all threats. *Vawter, supra*, 136 *N.J.* at 75, 642 *A.2d* 349. The Court concluded that in adopting those sections, the Legislature was "obviously expressing its disagreement with the message conveyed by the conduct that the statutes regulate." *Id.* at 68, 642 *A.2d* 349. The Court "reluctantly" based its decision on the Supreme Court's decision in *R.A.V., supra. Id.* at 70, 642 *A.2d* 349. In his separate opinion in *Vawter*, Justice Stein perceived the flawed logic of *R.A.V.*'s "underbreadth" analysis. *Id.* at 98, 642 *A.2d* 349 (Stein J., concurring). He viewed Sections 10 and 11 as step-by-step legitimate responses to "the most virulent and dangerous formulation of bias-motivated incitements to violence." *Ibid.*

Mortimer, on the other hand, had been charged with one count of harassment under *N.J.S.A.* 2C:33–4d. Distinguishing the harassment provisions in Section 4d from those in Sections 10 and 11, the Court dismissed Mortimer's First Amendment challenge. Justice Clifford explained that the St. Paul ordinance "prohibited the expression of hate," while Section 4d "increases the level of the crime only when a person acts on his or her beliefs and selects the victim with a purpose to intimidate because of one of the specified circumstances—race, color, religion, sexual orientation, or ethnicity....[Thus,] Section 4 proscribes only the harassing conduct itself." *Mortimer, supra*, 135 *N.J.* at 528, 641 *A.2d* 257. The Court concluded that the statutory language, "at least in part with ill will, hatred or bias toward the victim," was unconstitutionally vague because it failed "to communicate with sufficient clarity what the statute prohibits." *Id.* at 533, 641 *A.2d* 257. In order to

avoid the vagueness problem and thus construe the statute constitutionally, the Court excised the vague language from subsection d. *Id.* at 534, 641 *A*.2d 257. Following the decision in *Mortimer*, the Legislature amended *N.J.S.A.* 2C:33–4d and *N.J.S.A.* 2C:44–3(e) to excise the vague language.

Although it is true that in *Wisconsin v. Mitchell*, the jury found that the defendant had intentionally selected his victim based on race, nothing in *Mitchell* or *Mortimer* alerted the Legislature to the concern that the penalty-enhancing provisions of its hate crime law would be unconstitutional because a judge, not a jury, found the biased purpose to intimidate by a preponderance of the evidence. The question is—when does due process require jury findings beyond a reasonable doubt.

## III

### A.

The Due Process Clause of the Fourteenth Amendment requires that the essential elements of a crime be proven beyond a reasonable doubt. *In Re Winship*, 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368 (1970). There is, however, no litmus test or unerring "constitutional calculus" for determining what is an essential element of a crime. *N.J.S.A.* 2C:1–14(h) defines an element of an offense as:

(1)such conduct or (2)such attendant circumstances or (3)such a result of conduct as

(a) is included in the description of the forbidden conduct in the definition of the offense;

(b) establishes the required kind of culpability;

(c) negatives an excuse or justification for such conduct;

(d) negatives a defense under the statute of limitations;

(e) establishes jurisdiction or venue.

These definitions do not explicitly cover Section 44–3(e).

*Mullaney v. Wilbur*, 421 *U.S.* 684, 704, 95 *S.Ct.* 1881, 1892, 44 *L.Ed.*2d 508, 522 (1975), held that under a Maine statute that defined the offense of first-degree murder in terms of the absence of heat of passion, due process required the State to bear the

burden on that fact. *Martin v. Ohio*, 480 *U.S.* 228, 234, 107 *S.Ct.* 1098, 1102, 94 *L.Ed.*2d 267, 274–75 (1987), upheld a law imposing on a defendant the burden of proof of self-defense because the same evidence will often negate the State's case even if insufficient to prove self-defense by a preponderance of the evidence. In *Patterson v. New York*, 432 *U.S.* 197, 220–21, 97 *S.Ct.* 2319, 2332, 53 *L.Ed.*2d 281, 298 (1977), because New York established the penalty for second-degree manslaughter on the basis of mitigation premised upon a finding of 'extreme emotional disturbance,' the Court permitted New York to impose on the defendant the burden of proving that factor. *McMillan v. Pennsylvania*, 477 *U.S.* 79, 106 *S.Ct.* 2411, 91 *L.Ed.*2d 67 (1986), upheld a Pennsylvania statute that contained a sentencing factor—"visible possession of a firearm"—the presence of which required the judge to impose a minimum prison term of five years. The Court held that the Constitution did not require Pennsylvania to treat the factor as an element of the crime. *Id.* at 91, 106 *S.Ct.* at 2419, 91 *L.Ed.*2d at 79. In so holding, the *McMillan* Court said that the State's "link[ing] the 'severity of punishment' to 'the presence or absence of an identified fact' " did not automatically make that fact an "element." *Id.* at 84, 106 *S.Ct.* at 2415, 91 *L.Ed.*2d at 75 (quoting *Patterson, supra*, 432 *U.S.* at 214, 97 *S.Ct.* at 2329, 53 *L.Ed.*2d at 294). Citing *Patterson*, the Supreme Court said that "the state legislature's definition of the elements of the offense is usually dispositive." *Id.* at 85, 106 *S.Ct.* at 2415, 91 *L.Ed.*2d at 75. It said that it would not "define precisely the constitutional limits" of a legislature's power to define the elements of an offense. *Id.* at 86, 106 *S.Ct.* at 2416, 91 *L.Ed.*2d at 76. Finally, the Supreme Court held that, whatever those limits might be, the State had not exceeded them. *Ibid.*

The primary concern of the Supreme Court in this series of cases has been whether "states would *circumvent due process* by redefining the essential elements of guilt as affirmative defenses or as sentencing factors." *State v. Krantz*, 241 *Mont.* 501, 788 *P.*2d 298, 304 (1990) (emphasis added), *cert. denied.*, 498 *U.S.* 938, 111 *S.Ct.* 341, 112 *L.Ed.*2d 306 (1990). Because the Supreme

Court has declined to "define precisely the constitutional limits" on the states' ability to define elements of an offense, *McMillan, supra,* 477 *U.S.* at 86, 106 *S.Ct.* at 2416, 91 *L.Ed.*2d at 76, we must attempt to determine what those limits are.

### B.

■ We begin by stating the obvious. Merely because the Legislature has placed the hate-crimes enhancer within the sentencing provisions of the Code of Criminal Justice does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense. Were that the case, the Legislature could just as easily allow judges, not juries, to determine if a kidnaping victim has been released unharmed. *See State v. Federico,* 103 *N.J.* 169, 510 *A.*2d 1147 (1986) (requiring State, in order to establish first-degree kidnaping offense, to prove beyond a reasonable doubt that victim was not released unharmed).[1]

Second, the constitutional question may not be avoided by characterizing a biased "purpose to intimidate" as a "motive". Of course it is true that motive is not an essential element of a crime. But in ordinary circumstances proof of motive does not increase the penal consequences to an actor. Whether one kills out of jealousy or for pecuniary gain does not increase the non-capital sentence for the crime. Whether one steals to put bread on a table or to feed a drug habit does not increase the sentence for theft. A finding under Section 2C:44–3(e) of a "motive" to intimidate because of the victim's race or ethnicity has vastly different consequences than in regular criminal proceedings. Labels do not afford an acceptable answer. Indeed, the exclusion of the words "at least in part with ill will, hatred or bias toward the victim"

---

[1] Federal courts have split on the extent to which a punishment scheme may be viewed as a sentence enhancement provision before it amounts to the definition of a new crime. *Compare United States v. Stone,* 139 *F.*3d 822 (11th Cir.1998), *with United States v. Palacios–Casquete,* 55 *F.*3d 557 (11th Cir.1995), *cert. denied,* 516 *U.S.* 1120, 116 *S.Ct.* 927, 133 *L.Ed.*2d 855 (1996).

limits our ability to view this finding as merely a search for motive. We must search for firmer principles of decision.

Our existing precedent does not control the disposition of this case. Although *Mortimer, supra,* assumed in the prosecution of a Section 4 harassment offense that evidence of a biased purpose would be "introduce[d] ... at trial" as part of the "required state of mind or *mens rea*" under the statute, 135 *N.J.* at 531, 534, 641 *A.*2d 257, the Court did not address the Section 43 sentence enhancer. Similarly, *State v. Camacho,* 153 *N.J.* 54, 56–57, 707 *A.*2d 455 (1998), posed the question for resolution in the case as "whether intent to use a firearm against the person, as opposed to the property, of another is an element" of possession of a weapon for an unlawful purpose entitling a defendant to a jury trial on that issue or was instead a sentencing factor for the court. *Camacho* did not explore the underlying question of the constitutional limits on allocating sentencing factors to a judge or jury.

## C.

Any disposition that we make is necessarily tentative in the sense that the final word on this subject will have to come from the United States Supreme Court. The recently enacted amendments to the federal sentencing guidelines now include a hate crime penalty enhancement provision that applies to all federal crimes. *See Violent Crime Control and Law Enforcement Act of 1994, Pub.L.N.* 103–322, § 280003 (1994), 108 *Stat.* 2096; 28 *U.S.C.A.* § 994. Effective November 1, 1995, federal sentencing guidelines provide that the defendant's offense level is to be increased by three levels

[i]f the finder of fact at trial or, in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person. . . .

[*U.S.S.G.,* § 3A1.1.]

Although the federal hate crimes law requires the jury to resolve the issue of biased purpose as part of any trial, the law allows, in

the same circumstances as of this case, a judge to determine beyond a reasonable doubt that the defendant intentionally selected the victim because of the race, creed, or other characteristic of the victim. Eventually then the United States Supreme Court will have to resolve the issue that we face in this case. For now, we must examine its existing precedent to determine the proper disposition.

In its most recent treatment of the subject, *Jones v. United States,* —— *U.S.* ——, 119 *S.Ct.* 1215, 1222, 143 *L.Ed.*2d 311 (1999), the Court, in order to avoid an interpretation that would pose "grave and doubtful constitutional questions," held as a matter of statutory construction, not constitutional requirement, that provisions of the federal carjacking statute that established higher penalties to be imposed when the offense results in serious bodily injury or death constituted additional essential elements of the offense. As essential elements of an offense, these factual matters must be decided beyond a reasonable doubt by a jury, not a judge. *In re Winship, supra,* 397 *U.S.* 358, 90 *S.Ct.* 1068, 25 *L.Ed.*2d 368. In the course of its opinion in *Jones,* the Court stated that

under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Because our prior cases suggest rather than establish this principle, our concern about the Government's reading of the [carjacking] statute rises only to the level of doubt, not certainty.

[*Jones, supra,* —— *U.S.* ——, 119 *S.Ct.* at 1224 n.6, 143 *L.Ed.*2d 311.]

The five members of the majority in *Jones* included one member who had joined a different formulation in the Supreme Court's 1998 opinion, *Almendarez–Torres v. United States,* 523 *U.S.* 224, 118 *S.Ct.* 1219, 140 *L.Ed.*2d 350 (1998).

Because the language in *Jones* was not essential to its holding, and because the Court did not expressly overrule the *Almendarez–Torres* formulation, we believe that case still states the ratio-

nale that we must apply here.[2] In *Almendarez–Torres,* the Court upheld a statute that treats an alien's earlier illegal entry as a sentencing factor upon a subsequent conviction of illegal re-entry, rather than as an element of that offense. *Id.* at ——, 118 *S.Ct.* at 1233, 140 *L.Ed.*2d at ——. The Court explained, "to hold that the Constitution requires that recidivism be deemed an 'element' of [an] offense would mark an abrupt departure from a longstanding tradition of treating recidivism as 'going to the punishment only.'" *Id.* at ——, 118 *S.Ct.* at 1231, 140 *L.Ed.*2d at ——(quoting *Graham v. West Virginia,* 224 *U.S.* 616, 629, 32 *S.Ct.* 583, 587–88, 56 *L.Ed.* 917 (1912)). Rather than to reinvent the analysis, we will simply restate it in full:

> In assessing petitioner's claim [that a jury not a judge would have to establish beyond a reasonable doubt that Almendarez had previously entered the country illegally], we have examined *McMillan* to determine the various features of the case upon which the Court's conclusion arguably turned. The *McMillan* Court pointed out: (1) that the statute plainly "does not transgress the limits expressly set out in *Patterson,*" *id.,* at 86, 106 *S.Ct.,* at 2416; (2) that the defendant (unlike *Mullaney's* defendant) did not face "'a differential in sentencing ranging from a nominal fine to a mandatory life sentence,'" 477 *U.S.,* at 87, 106 *S.Ct.,* at 2417 (quoting *Mullaney,* 421 *U.S.,* at 700, 95 *S.Ct.,* at 1890); (3) that the statute did not "alte[r] the maximum penalty for the crime" but "operates solely to limit the sentencing court's discretion in selecting a penalty within the range already available to it," 477 *U.S.,* at 87–88, 106 *S.Ct.,* at 2417; (4) that the statute did not "creat[e] a separate offense calling for a separate penalty," *id.,* at 88, 106 *S.Ct.,* at 2417; and (5) that the statute gave "no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense," but, to the contrary, "simply took one factor that has always been considered by sentencing courts to bear on punishment ... and dictated the precise weight to be given that factor," *id.,* at 88, 89–90, 106 *S.Ct.,* at 2417, 2418.
> [*Id.* at ——, 118 *S.Ct.* at 1230, 140 *L.Ed.*2d at ——.]

With but one exception, that the Section 44–3(e) finding does "alter the maximum penalty for the crime," the hate-crimes enhancer resembles *McMillan* in respect of all of the other factors. The statute plainly does not transgress the limits set out in

---

[2] We acknowledge that the *Jones* Court specifically excepted recidivism or prior convictions from its general statement of the law concerning sentence enhancers, and therefore had no occasion to overrule *Almendarez–Torres. Jones, supra,* —— *U.S.* ——, 119 *S.Ct.* at 1227, 143 *L.Ed.*2d ——.

*Patterson* that due process of law does not allow the state to shift the burden of proof by presuming a necessary ingredient upon proof of the other elements of the offense, 432 *U.S.* at 215, 97 *S.Ct.* at 2329–30, 53 *L.Ed.*2d at 295 (1975); the differential in sentencing is not between a nominal fine and mandatory life sentence; the statute does not create a separate offense calling for a separate penalty; the statute gives no impression of having been tailored to permit the bias finding to be a "tail that wags the dog of the substantive offense." There is simply no indication that the Legislature restructured its criminal code and sentencing structures in an attempt to "evade" the commands of *Winship, supra,* a dominant theme underlying the Court's decision in *Mullaney, supra,* 421 *U.S.* at 698, 95 *S.Ct.* at 1889, 44 *L.Ed.*2d at 519; *see Adamson v. Ricketts,* 865 *F.*2d 1011 (9th Cir.1988) *cert. denied,* 497 *U.S.* 1031, 110 *S.Ct.* 3287, 111 *L.Ed.*2d 795 (1990)(invalidating Arizona's death sentencing provisions in part because it *withdrew* from its substantive criminal law various elements traditionally reserved for jury determination and reclassified them as sentencing factors).

On the contrary, the Legislature simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor. A finding of a biased motive or purpose to intimidate, like the factor of recidivism in the *Almendarez–Torres* analysis, is a very traditional sentencing factor. *N.J.S.A.* 2C:44–1(2) has long allowed sentencers to take into account the gravity of the harm inflicted on the victim.

Altering the maximum penalty in and of itself has been held not to change the constitutional calculus. In *State v. Krantz, supra,* 788 *P.*2d at 303, the Montana Supreme Court found that its "weapon enhancement" sentencing statute did not offend due process even though the determination of weapon usage "could lead to a punishment beyond the maximum provided for the underlying crime." It reasoned that the Montana weapon enhancement statute does not create a separate crime or element of

a crime. In another sense, a discretionary sentence enhancer may not have as drastic a penal consequence as a mandatory sentence without possibility of parole.

We agree with the concurring member of the Appellate Division that, like our Graves Act decisions, this decision will pose no threat to constitutional liberties. Almost invariably there is no real doubt about the factual issue that determines the sentencing decision. In *State v. White*, 98 *N.J.* 122, 484 *A.*2d 691 (1984), the underlying conviction of robbery in the first degree was based on the presence of a firearm. The legal issue was whether an accomplice who did not actually possess the weapon could be sentenced to a Graves Act sentence. In *State v. Stewart*, 96 *N.J.* 596, 477 *A.*2d 300 (1984), the defendant admitted that there were firearms in the truck that he was using at the time of the robbery, but contended that such constructive possession, as opposed to use, did not warrant a Graves Act sentence. In like fashion, we believe that in cases like *Vawter* (had the defendants been charged other than under Sections 10 & 11) and *Mortimer*, there is rarely any doubt whether the defendants committed the crimes with the purpose of intimidating the victim on the basis of race or ethnicity. In addition, enhanced sentencing under Section 44-3(e) is limited to cases in which there is said to be a "compelling State interest" to vindicate constitutional rights to be free of invidious discrimination. *People v. MacKenzie*, 34 *Cal.App.*4th 1256, 40 *Cal.Rptr.*2d 793, 800-01 (Ct.App.1995) (citing *Mitchell, supra*, 508 *U.S.* at 488, 113 *S.Ct.* at 2201, 124 *L.Ed.*2d at 447).

*Amicus* Public Defender has prudently argued that the Court should hesitate to endorse this sentencing scheme because the concept (removing the elements of a crime from its substantive definition and including them in the sentencing provisions of the Code) could undermine traditional rights to trial by jury and the due process of law. There should be no mistake that the Court would not permit the Legislature (even were it so inclined) to remove traditional *mens rea* or grading factors (such as the absence of passion/provocation in a murder) from the substantive

definition of a crime to be determined by a jury and reallocate them for determination by a judge as part of the sentencing process. *See State v. Smith,* 279 *N.J.Super.* 131, 652 *A.*2d 241 (App.Div.1995) (holding grading provisions based on age of kidnaping victim are elements of offense). The issue posed in this case is all but idiosyncratic owing to the constitutional concerns about punishing thought itself.

We acknowledge that Florida has interpreted its similarly-worded statute to require a jury to find as a predicate to sentencing that the crime was bias motivated. *State v. Stalder,* 630 *So.*2d 1072 (Fla.1994). We believe that resolution poses as many problems as it solves. To allow generally in criminal trials proof of the biases of the accused creates an added risk of prejudice for defendants. It would open trials to evidence of former acts of bias on the part of the actor. *Ayers v. State,* 335 *Md.* 602, 645 *A.*2d 22 (Md.1994) *cert. denied,* 513 *U.S.* 1130, 115 *S.Ct.* 942, 130 *L.Ed.*2d 886 (1995); *but see Mortimer, supra,* 135 *N.J.* at 538, 641 *A.*2d 257 (cautioning that as condition of admission of other acts of bias, the nexus between incidents must be strong). It would inject into the trial of cases issues of racial or ethnic bias that have a potential to inflame a jury. *State v. Crumb,* 277 *N.J.Super.* 311, 321, 649 *A.*2d 879 (App.Div.1994), *certif. denied.,* 153 *N.J.* 215, 708 *A.*2d 66 (1998). In *Crumb, supra,* because "the bias count ... may, if tried with the other counts, skew decisions regarding admission of evidence," the court severed the bias count from the trial. *Ibid.* In *State v. Carter,* 91 *N.J.* 86, 449 *A.*2d 1280 (1982), the Court narrowly affirmed the murder conviction of defendants, holding that the admission of evidence tending to show that their actions were motivated by racial revenge was not so prejudicial as to outweigh its probative value.

## IV

To sum up, as the dissent observes, *post* at 50, 731 *A.*2d at 511, a statutory argument can be made that the actor's biased purpose to intimidate establishes a required kind of culpability, an element

of the offense that must be determined by the jury. However, the biased purpose is not an element of the weapons possession charge. It sufficed to establish that offense that defendant intended to shoot at the victim's home, an unlawful purpose in itself. The more significant problem with defendant's statutory argument is that the Legislature has expressly provided otherwise. The question then is not statutory but constitutional. The reasons that impelled the Legislature to provide that the actor's biased purpose be treated as a sentencing factor are not constitutionally suspect. There is a subtle interplay of constitutional values involved—a First Amendment concern expressed in *R.A.V.* that society not punish thought itself, even hateful thoughts, and a compelling state interest to vindicate the rights of citizens to be free of invidious discrimination. *Wisconsin v. Mitchell, supra,* 508 *U.S.* at 487, 113 *S.Ct.* at 2201, 124 *L.Ed.*2d at 447.

"To declare a statute unconstitutional is a judicial power to be delicately exercised." *Harvey v. Essex County Bd. of Freeholders,* 30 *N.J.* 381, 388, 153 *A.*2d 10 (1959). "[A] legislative act [should] not be declared void unless its repugnancy to the constitution is clear beyond reasonable doubt." *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957). The claim that the statute here conflicts with a constitutional right is far from clear beyond a reasonable doubt. On balance, we find that in this case the "constitutional calculus" of *McMillan* sustains the statutory scheme. The hate-crime enhancer obviously requires a delicate balance of constitutional rights. We do not punish thought. We do punish more severely crimes involving particularly vulnerable victims.[3] We are certain that the law will not be abused. The

---

[3] "[T]here may be an exception to the general rule that the preponderance standard satisfies due process when a sentencing factor has an extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v. Restrepo,* 946 *F.*2d 654, 659 (9th Cir.1991), *cert. denied,* 503 *U.S.* 961, 112 *S.Ct.* 1564, 118 *L.Ed.*2d 211 (1992) (citation omitted). We need not decide today whether the enhancement of a ten-to-twenty year first-degree offense to life imprisonment under *N.J.S.A.* 2C:44–3(e) would offend due process.

requirements of the act are strict. It is not enough to show that during the commission of a crime the actor may have exhibited bias. The question is whether the purpose of the crime was to exhibit bias. In *Dobbins v. State*, 605 *So.*2d 922 (Fla.Dist.Ct.App. 1992), *aff'd*, 631 *So.*2d 303 (Fla.1994), the court found that evidence of the defendant's racial bias against people of the Jewish faith was not enough to invoke a sentence enhancement; rather, the jury must find that the defendant intentionally chose the victim, and committed the crime because of the racial motivation. *Id.* at 923; *see also Abbott v. State*, 705 *So.*2d 923 (1997) (explaining that it is insufficient to exhibit bias in the course of committing crime; rather actor must intentionally select victim because of victim's race, creed, color or ethnicity). The use of the term "because of" in a hate-crime statute "connotes a causal link between the infliction of injury and bias motivation...." *Martinez v. State*, 980 *S.W.*2d 662, 667 (Tex. Ct.App.1998 pet. ref'd).

There is one troubling aspect to this case. The trial court did not articulate the current statutory standard in sentencing. At the time of sentencing, although counsel was aware of the *Mortimer* decision, court and counsel were seemingly unaware of the then recent amendment to Section 44–3(e) that had excised, on the basis of *Mortimer*, the offending language concerning one having acted "at least in part" with ethnic bias or ill will in committing the crime. Although the issue of the court's articulation of the sentence is not before us on the basis of the dissent below, we are satisfied that no court could but conclude that the actor's purpose was, in fact, to intimidate the victims because of their color. The only question before the trial court was whether defendant's mental state, subjected to alcoholism, was such that he could not form the biased purpose. The trial court's review of the evidence

---

If a defendant has committed a first-degree crime and selected a victim for reasons of bias, the law provides ample remedies. *See State v. Crumb*, 307 *N.J.Super.* 204, 704 *A.*2d 952 (App.Div.1997), *certif. denied*, 153 *N.J.* 215, 708 *A.*2d 66 (1998) (imposing sentence of life with a thirty-year parole ineligibility period for biased killing).

submitted by defendant adequately disposed of that issue. There is no real question as to this actor's purpose in shooting into his neighbors' home.

In addition, we believe the sentence imposed was fair and just. Defendant was exposed to three charges of attempted murder and three charges of attempted aggravated assault with a weapon. If convicted of all counts he could have faced life in prison. His plea bargain exposed him to a sentence of thirty-five years with a twelve-year ineligibility period. (Although the plea form recites a maximum of ten years on each weapon count, it was understood that one of these sentences could be enhanced.) Had unenhanced sentences on the two separate unlawful possession of weapons offenses been made consecutive, defendant would have been exposed to twenty years' imprisonment with six years of parole ineligibility. The sentence imposed was twelve years' imprisonment with four years of parole ineligibility. A satisfactory plea bargain afforded a fair and just resolution of the matter to the State and to defendant. We would not disturb the sentence in this case.

The judgment of the Appellate Division is affirmed.

STEIN, J., dissenting.

In *In re Winship*, 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1073, 25 *L.Ed.*2d 368 (1970), the United States Supreme Court explicitly held that "the Due Process Clause protects the accused [in a criminal proceeding] against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." This appeal requires this Court to apply the holding of *In re Winship* for the first time to one of the sentencing enhancement provisions of the Code of Criminal Justice, *N.J.S.A.* 2C:1–1 to 104–9, and to determine whether the Due Process Clause permits a judge, rather than a jury, to decide by a preponderance-of-the-evidence standard whether the sentencing enhancement factor has been proved.

The Court today affirms the judgment of the Appellate Division sustaining the constitutionality of *N.J.S.A.* 2C:44–3(e), pursuant to which the trial court is authorized to determine by a preponderance of the evidence that the Appellate Division defendant in committing the crimes with which he is charged acted "with a purpose to intimidate an individual or ... individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." Based on that determination, the statute authorizes the court to sentence the defendant to an extended term of imprisonment. In effect, a trial court's finding that a defendant committed bias crimes pursuant to *N.J.S.A.* 2C:44–3(e) causes that defendant's offenses to be graded one degree higher for sentencing purposes: third-degree crimes are sentenced as second-degree crimes, second-degree crimes are sentenced as first-degree crimes, and first-degree crimes are subject to a sentence between twenty years' and life imprisonment. See *N.J.S.A.* 2C:43–7(a).

In my view, the critical determination required by the statute, that a defendant's mental state in committing the subject offense encompassed a purpose to intimidate because of race, necessarily involves a finding so integral to the charged offense that it must be characterized as an element thereof. Moreover, the significantly increased sentencing range triggered by that statute also persuades me that the finding of a purpose to intimidate must be treated as a material element of a defendant's crimes, and that the material element must be found by a jury beyond a reasonable doubt. Accordingly, I conclude that *N.J.S.A.* 2C:44–3(e) is unconstitutional because it permits the finding of a purpose to intimidate based on race to be made by a judge under a preponderance-of-the-evidence standard.

I

Defendant pled guilty to two counts of a twenty-two count indictment charging him with the second-degree offense of possession of a firearm for the purpose of using it unlawfully on September 24 and December 22, 1994, *N.J.S.A.* 2C:39–4(a), and to

one count charging him with the third-degree offense of knowing possession of a destructive device (an anti-personnel bomb), *N.J.S.A.* 2C:39–3(a). Defendant's plea was conditioned on the right to appeal his sentence. The State moved to have defendant sentenced to an extended term pursuant to *N.J.S.A.* 2C:44–3 which at the time of defendant's offenses provided:

> The court shall, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime, ... to an extended term if it finds, by a preponderance of the evidence, the grounds in subsection e. ...
>
> e. The defendant in committing the crime acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity.
>
> [*Ibid.* But see L. 1995, c. 211, § 3, eff. Aug. 14, 1995 (amending text of statute to delete phrase "at least in part, with ill will, hatred or bias toward, and").]

The facts giving rise to defendant's indictment indicated that on September 24 and December 22, 1994, defendant fired shots into a home in his neighborhood in Vineland that was occupied by an African–American family. The September incident involved a single bullet shot through the window of a bedroom in which a nine-year-old child slept. On December 22, 1994, defendant fired eight rounds from a rifle through the front door of the home. Because defendant's truck was observed driving away from the victims' house immediately after the shooting in December, police officers proceeded to defendant's home and took him into custody. After *Miranda* warnings were administered, defendant allegedly told police that he shot at the house because African–Americans lived there, stating that "he knew that there were black people who lived at that residence because he's seen them out in the yard. And he was giving them a message that they were in his neighborhood."

At his plea hearing defendant admitted that he shot at the victims' home on September 24, 1994 and December 22, 1994, and that he did so "for an unlawful purpose." He retracted that admission during the hearing conducted to determine whether he was subject to an extended term because he committed the crimes while acting with bias and to intimidate the victims because of their race. *N.J.S.A.* 2C:44–3(e). He denied knowing that an

African–American family lived in the home and denied shooting at the home on the two occasions charged in the indictment. At the hearing character witnesses testified that defendant did not have a reputation in the community for being biased against African–Americans.

The court found that defendant committed the offenses while acting with bias and a purpose to intimidate the victims because of their race. The court sentenced defendant to twelve years' imprisonment with four years' parole ineligibility on one of the counts of possession of a firearm for an unlawful purpose, and to a seven-year term with three years' parole ineligibility on the other charge of possession of a firearm for an unlawful purpose. On the charge of possession of an anti-personnel bomb, defendant was sentenced to three years' imprisonment. All sentences were concurrent. The court observed that defendant's sentence to less than the presumptive term for first-degree crimes was based on testimony indicating that he suffered from psychological problems and that his unlawful behavior was aberrational.

A divided panel of the Appellate Division upheld the constitutionality of *N.J.S.A.* 2C:44–3(e) and affirmed defendant's sentence. 304 *N.J.Super.* 147, 698 *A.*2d 1265 (1997). Judge Wecker dissented, concluding that the statute was unconstitutional because it deprived defendant of a jury determination beyond a reasonable doubt on whether defendant had committed the charged offenses with a purpose to intimidate the victims because of their race. *Id.* at 161–67, 698 *A.*2d 1265. Defendant appeals to this Court as of right. *R.* 2:2–1(a)(2).

## II

Not only is the due process issue before us one of first impression for this Court, but its resolution is neither dictated nor clearly forecast by the handful of United States Supreme Court precedents that bear on the question.

The landmark decision is *In re Winship, supra,* in which the Supreme Court reviewed a delinquency determination by a New

York Family Court judge who found that appellant, then a twelve-year-old boy, had stolen $112 from a woman's pocketbook. Acknowledging that the evidence might not establish guilt beyond a reasonable doubt, the court rejected the appellant's contention that that standard of proof was mandated by the Fourteenth Amendment, and relied instead on a provision of the New York Family Court Act that authorized delinquency determinations to be based on a preponderance of the evidence. At a dispositional hearing appellant was placed in a training school for eighteen months, subject to annual extensions until his eighteenth birthday. *In re Winship, supra,* 397 *U.S.* at 359–60, 90 *S.Ct.* at 1070, 25 *L.Ed.*2d at 372–73.

In an opinion by Justice Brennan, the Supreme Court took note of the longstanding common-law principle that required proof beyond a reasonable doubt to establish guilt of criminal charges:

> The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation. The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." C. McCormick, *Evidence* § 321, pp. 681–82 (1954). Although virtually unanimous adherence to the reasonable-doubt standard in common-law jurisdictions may not conclusively establish it as a requirement of due process, such adherence does "reflect a profound judgment about the way in which law should be enforced and justice administered." *Duncan v. Louisiana,* 391 *U.S.* 145, 155, 20 *L.Ed.*2d 491, 499, 88 *S.Ct.* 1444 (1968). [*Id.* at 361–62, 90 *S.Ct.* at 1071, 25 *L.Ed.*2d at 373–74 (alteration in original) (citation omitted).]

The Court also emphasized the practical and moral justifications for the requirement of proof beyond a reasonable doubt in criminal trials, holding expressly for the first time that that standard of proof was mandated by the Due Process Clause:

> "There is always in litigation a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of . . . persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the factfinder of his guilt."

[quoting *Speiser v. Randall*, 357 *U.S.* 513, 525–26, 78 *S.Ct.* 1332, 1342, 2 *L.Ed.*2d 1460, 1472–73 (1958).] . . . .

Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned. . . .

Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.

[*Id.* at 364, 90 *S.Ct.* at 1072–73, 25 *L.Ed.*2d at 375.]

Reversing the New York Court of Appeals, the Supreme Court invalidated the New York statute permitting delinquency determinations to be based merely on a preponderance of the evidence. The Court stated:

In sum, the constitutional safeguard of proof beyond a reasonable doubt is as much required during the adjudicatory stage of a delinquency proceeding as are those constitutional safeguards applied in *Gault*—notice of charges, right to counsel, the rights of confrontation and examination, and the privilege against self-incrimination. We therefore hold, in agreement with Chief Judge Fuld in dissent in the Court of Appeals, "that, where a 12–year–old child is charged with an act of stealing which renders him liable to confinement for as long as six years, then, as a matter of due process . . . the case against him must be proved beyond a reasonable doubt." 24 *N.Y.*2d at 207, 299 *N.Y.S.*2d at 423, 247 *N.E.*2d at 260.

[*Id.* at 368, 90 *S.Ct.* at 1075, 25 *L.Ed.*2d at 377–78.]

The Supreme Court first had occasion to apply the *Winship* principle in *Mullaney v. Wilbur*, 421 *U.S.* 684, 95 *S.Ct.* 1881, 44 *L.Ed.*2d 508 (1975), a case in which the defendant's trial and conviction of murder in Maine occurred approximately four years prior to the *Winship* decision. At that trial the defendant did not contest his responsibility for the homicide, but alleged that he had acted in a frenzy provoked by the victim's homosexual advance. On that basis his counsel asserted that at most the homicide was manslaughter, having been committed in the heat of passion provoked by the victim's advances. The trial court instructed the jury that under Maine law murder and manslaughter are both subsets of homicide, and both offenses require the State to prove that the homicide was intentional and unjustifiable. The court further charged that malice aforethought, an essential element of murder, was to be conclusively implied unless the defendant

proved by a preponderance of the evidence that he acted in the heat of passion on sudden provocation. After requesting reinstruction on the doctrine of implied malice aforethought and on the meaning of "heat of passion," the jury convicted the defendant of murder. The Maine Supreme Judicial Court affirmed, *State v. Wilbur*, 278 *A*.2d 139 (1971), rejecting the contention that requiring defendant to prove that he acted in the heat of passion to overcome the presumption of malice aforethought was contrary to the due process protection afforded by *Winship*. *Mullaney, supra*, 421 *U.S.* at 687–88, 95 *S.Ct.* at 1883–84, 44 *L.Ed.*2d at 513.

In an opinion by Justice Powell, the Supreme Court acknowledged that at common law the burden of proving heat of passion on sudden provocation was borne by the defendant, but noted that that approach had since been rejected by the Court, *Davis v. United States*, 160 *U.S.* 469, 16 *S.Ct.* 353, 40 *L.Ed.* 499 (1895), and by the majority of states. *Mullaney, supra*, 421 *U.S.* at 696, 95 *S.Ct.* at 1888, 44 *L.Ed.*2d at 517–18. The Court also rejected Maine's contention that the holding of *Winship* applied only to the elements of a crime as defined by state law:

> Moreover, if *Winship* were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting any substantive change in its law. It would only be necessary to redefine the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment. An extreme example of this approach can be fashioned from the law challenged in this case. Maine divides the single generic offense of felonious homicide into three distinct punishment categories—murder, voluntary manslaughter, and involuntary manslaughter. Only the first two of these categories require that the homicidal act either be intentional or the result of criminally reckless conduct. But under Maine law these facts of intent are not general elements of the crime of felonious homicide. Instead, they bear only on the appropriate punishment category. Thus, if petitioners' argument were accepted, Maine could impose a life sentence for any felonious homicide—even one that traditionally might be considered involuntary manslaughter—unless the defendant was able to prove that his act was neither intentional nor criminally reckless.
>
> *Winship* is concerned with substance rather than this kind of formalism.
>
> [*Id*. at 698–99, 95 *S.Ct.* at 1888–89, 44 *L.Ed.*2d at 519–20 (citations omitted).]

Accordingly, the Court invalidated the Maine homicide statute, holding that in homicide prosecutions the State bears the burden

of proving beyond a reasonable doubt the absence of heat of passion on sudden provocation:

> Maine law requires a defendant to establish by a preponderance of the evidence that he acted in the heat of passion on sudden provocation in order to reduce murder to manslaughter. Under this burden of proof a defendant can be given a life sentence when the evidence indicates that it is as likely as not that he deserves a significantly lesser sentence. This is an intolerable result in a society where, to paraphrase Mr. Justice Harlan, it is far worse to sentence one guilty only of manslaughter as a murderer than to sentence a murderer for the lesser crime of manslaughter. We therefore hold that the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case. Accordingly, the judgment below is reversed.
>
> [*Id.* at 703–04, 95 *S.Ct.* at 1892, 44 *L.Ed.*2d at 522 (citations omitted).]

In *Patterson v. New York*, 432 *U.S.* 197, 97 *S.Ct.* 2319, 53 *L.Ed.*2d 281 (1977), the Court, in a 5–3 vote, qualified its holding in *Mullaney* by sustaining a New York statute that defined second-degree murder as "causing the death of another person with intent to do so" and placing on the defendant the burden of proving by a preponderance of the evidence the affirmative defense of extreme emotional disturbance. In *Patterson* the defendant, estranged from his wife, observed through a window that she was partially unclothed in the presence of the victim. He entered the house with a rifle, killing the victim with two shots to the head. Patterson was charged with second-degree murder which, under New York law, required proof only of "intent to cause the death of another person" and "caus[ing] the death of such person or of a third person." N.Y. Penal Law § 125.25 (McKinney 1975). Unlike the Maine statute at issue in *Mullaney*, malice aforethought was not an element of second-degree murder under New York law. The statute provided as an affirmative defense that the accused acted "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse," *ibid.*, and the trial court instructed the jury that the defendant had the burden of proving that defense by a preponderance of the evidence. The court further instructed the jury that if the defendant established that affirmative defense, it must convict him of manslaughter rather than murder. The jury convicted Patterson

of murder. The New York Court of Appeals sustained the conviction against a due process challenge, 39 *N.Y.*2d 288, 383 *N.Y.S.*2d 573, 347 *N.E.*2d 898 (1976), distinguishing *Mullaney* on the basis that the New York statute did not shift to the defendant the burden of disproving any fact essential to establishing the elements of second-degree murder. *Patterson, supra*, 432 *U.S.* at 198–200, 97 *S.Ct.* at 2321–22, 53 *L.Ed.*2d at 284–86.

In an opinion by Justice White, the Court upheld the New York statute on the basis that it imposed on the State the burden of proving all elements of the offense beyond a reasonable doubt.

We cannot conclude that Patterson's conviction under the New York law deprived him of due process of law. The crime of murder is defined by the statute, which represents a recent revision of the state criminal code, as causing the death of another person with intent to do so. The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are either presumed or inferred in order to constitute the crime. The statute does provide an affirmative defense—that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation—which, if proved by a preponderance of the evidence, would reduce the crime to manslaughter, an offense defined in a separate section of the statute. . . .

Here, the jury was instructed in accordance with the statute, and the guilty verdict confirms that the State successfully carried its burden of proving the facts of the crime beyond a reasonable doubt. Nothing in the evidence, including any evidence that might have been offered with respect to Patterson's mental state at the time of the crime, raised a reasonable doubt about his guilt as a murderer; and clearly the evidence failed to convince the jury that Patterson's affirmative defense had been made out. It seems to us that the State satisfied the mandate of *Winship* that it prove beyond a reasonable doubt "every fact necessary to constitute the crime with which [Patterson was] charged."

[*Id.* at 205–206, 97 *S.Ct.* at 2324–25, 53 *L.Ed.*2d at 289 (alteration in original) (citation omitted).]

The Court also observed that New York was not constitutionally compelled to disprove the availability of affirmative defenses to murder:

It is also very likely true that fewer convictions of murder would occur if New York were required to negative the affirmative defense at issue here. But in each instance of a murder conviction under the present law, New York will have proved beyond a reasonable doubt that the defendant has intentionally killed another person, an act which it is not disputed the State may constitutionally criminalize and punish. If the State nevertheless chooses to recognize a factor that mitigates the degree of criminality or punishment, we think the State may assure itself that

the fact has been established with reasonably certainty. To recognize at all a mitigating circumstance does not require the State to prove its nonexistence in each case in which the fact is put in issue, if in its judgment this would be too cumbersome, too expensive, and too inaccurate.

[*Id.* at 209, 97 *S.Ct.* at 2326, 53 *L.Ed.*2d at 291.]

Finally, the Court distinguished *Mullaney* on the basis that the New York statute, unlike the Maine statute, did not presume an element of the crime unless rebutted by the defendant. Distinguishing the Maine statute at issue in *Mullaney,* the Court noted that

[p]remeditation was not within the definition of murder; but malice, in the sense of the absence of provocation, was part of the definition of that crime. Yet malice, i.e., lack of provocation, was presumed and could be rebutted by the defendant only by proving by a preponderance of the evidence that he acted with heat of passion upon sudden provocation. In *Mullaney* we held that however traditional this mode of proceeding might have been, it is contrary to the Due Process Clause as construed in *Winship.*

As we have explained, nothing was presumed or implied against Patterson; and his conviction is not invalid under any of our prior cases.

[*Id.* at 215–16, 97 *S.Ct.* at 2330, 53 *L.Ed.*2d at 295.]

Justice Powell, in a dissenting opinion joined by Justices Brennan and Marshall, sharply criticized what he characterized as the Court's formalistic distinctions between *Mullaney* at *Patterson:*

Perhaps the Court's interpretation of *Winship* is consistent with the letter of the holding in that case. But little of the spirit survives. Indeed, the Court scarcely could distinguish this case from *Mullaney* without closing its eyes to the constitutional values for which *Winship* stands. As Mr. Justice Harlan observed in *Winship,* "a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." Explaining *Mullaney,* the Court says today, in effect, that society demands full confidence before a Maine factfinder determines that heat of passion is missing—a demand so insistent that this Court invoked the Constitution to enforce it over the contrary decision by the State. But we are told that society is willing to tolerate far less confidence in New York's factual determination of precisely the same functional issue. One must ask what possibly could explain this difference in societal demands. According to the Court, it is because Maine happened to attach a name—"malice aforethought"—to the absence of heat of passion, whereas New York refrained from giving a name to the absence of extreme emotional disturbance.

With all respect, this type of constitutional adjudication is indefensibly formalistic. A limited but significant check on possible abuses in the criminal law now becomes an exercise in arid formalities. What *Winship* and *Mullaney* had sought

to teach about the limits a free society places on its procedures to safeguard the liberty of its citizens becomes a rather simplistic lesson in statutory draftsmanship. [*Id.* at 223–24, 97 *S.Ct.* at 2334, 53 *L.Ed.*2d at 300–01 (citations omitted).]

Nine years after its decision in *Patterson,* the Supreme Court revisited the *Winship* issue in *McMillan v. Pennsylvania,* 477 *U.S.* 79, 106 *S.Ct.* 2411, 91 *L.Ed.*2d 67 (1986). *McMillan* concerned the constitutionality under the Due Process Clause and the Sixth Amendment's jury trial guarantee of Pennsylvania's Mandatory Minimum Sentencing Act, 42 Pa. Cons.Stat. § 9712 (1982) (Act). That Act provides that any person convicted of certain enumerated felonies must be sentenced to a minimum of five years' imprisonment if the sentencing judge determines, based on a preponderance of the evidence, that the person "visibly possessed a firearm" during the commission of the offense. However, the Act does not permit imposition of a sentence greater than that otherwise authorized for the underlying offense.

Each of the petitioners in *McMillan* was convicted of one of the enumerated felonies under the Act, and in all four cases the Commonwealth gave notice of its intent to proceed under the Act's mandatory sentencing provisions. No hearings were held, however, because the sentencing judges found the Act unconstitutional. The Supreme Court of Pennsylvania consolidated the four appeals and held that the Act did not violate the due process guarantee, *Commonwealth v. Wright,* 508 *Pa.* 25, 494 *A.*2d 354 (1985), rejecting petitioners' contention that visible possession of a firearm is an element of each felony that must be proved beyond a reasonable doubt. *McMillan, supra,* 477 *U.S.* at 81–84, 106 *S.Ct.* at 2413–15, 91 *L.Ed.*2d at 73–75.

The Supreme Court affirmed 5–4, in an opinion authored by then Justice Rehnquist. Relying primarily on its decision in *Patterson,* the Court emphasized the significance of the State's definition of the elements of a crime in applying the *Winship* principle:

Patterson stressed that in determining what facts must be proved beyond a reasonable doubt the state legislature's definition of the elements of the offense is usually dispositive: "[T]he Due Process Clause requires the prosecution to prove

> beyond a reasonable doubt all of the elements *included in the definition of the offense* of which the defendant is charged." *Id.,* at 210, 97 *S.Ct.* at 2327 (emphasis added). While "there are obviously constitutional limits beyond which the States may not go in this regard," *ibid.,* "[t]he applicability of the reasonable-doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case," *id.,* at 211, n. 12, 97 *S.Ct.* at 2327.
>
> [*Id.* at 85, 106 *S.Ct.* at 2415, 91 *L.Ed.*2d at 75 (alteration in original).]

Although acknowledging the existence of constitutional limits on a state's power to define the elements of an offense for due process purposes, the *McMillan* majority concluded that the Pennsylvania statute did not exceed those limits, and offered three justifications for that conclusion. First, unlike in *Mullaney,* the Act did not create an impermissible presumption relieving the prosecutor of the burden of proving an element of the offense. Second, the statute did not increase the maximum sentence beyond that imposed for violation of the underlying offense. Third, the statute did not appear to represent a legislative attempt to evade the reasonable doubt requirement. *Id.* at 86–89, 106 *S.Ct.* at 2416–18, 91 *L.Ed.*2d at 76–78.

Dissenting, Justice Marshall, joined by Justices Brennan and Blackmun, rejected the majority's thesis and emphasized that "[w]hether a particular fact is an element of a criminal offense that, under *In re Winship,* must be proved by the prosecution beyond a reasonable doubt is a question that must be decided by this Court and cannot be abdicated to the States." *Id.* at 93, 106 *S.Ct.* at 2420, 91 *L.Ed.*2d at 81 (Marshall, J., dissenting) (citation omitted).

In a separate dissent, Justice Stevens, who joined the majority in *Patterson,* rejected the majority's assertion that courts should defer to a state legislature's definition of a crime in determining the application of due process protections:

> Today the Court holds that state legislatures may not only define the offense with which a criminal defendant is charged, but may also authoritatively determine that the conduct so described—i.e., the prohibited activity which subjects the defendant to criminal sanctions—is *not* an element of the crime which the Due Process Clause requires to be proved by the prosecution beyond a reasonable doubt. In my view, a state legislature may not dispense with the requirement of proof beyond a reasonable doubt for conduct that it targets for severe criminal penalties. Because

the Pennsylvania statute challenged in this case describes conduct that the Pennsylvania Legislature obviously intended to prohibit, and because it mandates lengthy incarceration for the same, I believe that the conduct so described is an element of the criminal offense to which the proof beyond a reasonable doubt requirement applies.

Once a State defines a criminal offense, the Due Process Clause requires it to prove any component of the prohibited transaction that gives rise to both a special stigma and a special punishment beyond a reasonable doubt.

[*Id.* at 96, 106 *S.Ct.* at 2421, 91 *L.Ed.*2d at 83 (Stevens, J., dissenting).]

Distinguishing *Patterson,* Justice Stevens characterized that holding as upholding a state's refusal to " 'prove beyond a reasonable doubt every fact, the existence or nonexistence of which it [was] willing to recognize as an *exculpatory or mitigating circumstance* affecting the degree of culpability or the severity of the punishment'—in that case, the affirmative defense of extreme emotional disturbance." *Id.* at 99, 106 *S.Ct.* at 2423, 91 *L.Ed.*2d at 84–85 (quoting *Patterson, supra,* 432 *U.S.* at 207, 97 *S.Ct.* at 2325, 53 *L.Ed.*2d at 290 (Stevens, J., dissenting)). Justice Stevens distinguished the "aggravating fact" of visible possession of a firearm from the "mitigating fact" implicated by *Patterson,* noting that

although States may reach the same destination either by criminalizing conduct and allowing an affirmative defense, or by prohibiting lesser conduct and enhancing the penalty, legislation proceeding along these two paths is very different even if it might theoretically achieve the same result.

[*McMillan, supra,* 477 *U.S.* at 100, 106 *S.Ct.* at 2424, 91 *L.Ed.*2d at 85–86 (Stevens, J., dissenting).]

Accordingly, Justice Stevens asserted that irrespective of the Pennsylvania Legislature's assertion that visible possession of a firearm is not an element of the offenses subject to the Act, the Due Process Clause requires that fact to be proved by the State beyond a reasonable doubt:

Appropriate respect for the rule of *In re Winship* requires that there be some constitutional limits on the power of a State to define the elements of criminal offenses. The high standard of proof is required because of the immense importance of the individual interest in avoiding both the loss of liberty and the stigma that results from a criminal conviction. It follows, I submit, that if a State provides that a specific component of a prohibited transaction shall give rise both to a special stigma and to a special punishment, that component must be treated as a "fact necessary to constitute the crime" within the meaning of our holding in *In re Winship.*

42

[*Id.* at 103, 106 *S.Ct.* at 2425, 91 *L.Ed.*2d at 87 (Stevens, J., dissenting).]

More than a decade after its decision in *McMillan* the Supreme Court again confronted the *Winship* issue in *Almendarez–Torres v. United States*, 523 *U.S.* 224, 118 *S.Ct.* 1219, 140 *L.Ed.*2d 350 (1998). The statute at issue in *Almendarez–Torres* was 8 *U.S.C.A.* § 1326. Subsection (a) of that statute authorizes a prison term of up to two years for any previously deported alien who returns to the United States without special permission. Subsection (b)(2) of the statute authorizes a prison term of up to twenty years for "any alien described" in subsection (a) whose initial "deportation was subsequent to a conviction for commission of an aggravated felony." The question before the Court was whether subsection (b)(2) defines a separate crime the elements of which would have to be proved beyond a reasonable doubt, or simply authorizes an enhanced penalty. By a 5–4 vote, the Court concluded that subsection (b)(2) "is a penalty provision, which simply authorizes a court to increase the sentence for a recidivist. It does not define a separate crime." 523 *U.S.* at ——, 118 *S.Ct.* at 1222, 140 *L.Ed.*2d at 357.

Petitioner Almendarez–Torres pled guilty to a federal indictment charging that he had been found in the United States after having been deported in violation of 8 *U.S.C.A.* § 1326. At his plea hearing he admitted that his earlier deportation had occurred on the basis of three earlier convictions for aggravated felonies. At his sentencing hearing, petitioner contended that his maximum sentence was two years because the indictment made no mention of his aggravated felony convictions. The District Court rejected that contention and imposed an eighty-five-month sentence. The Fifth Circuit Court of Appeals affirmed.

In affirming the lower courts, the Supreme Court initially relied on *McMillan, supra,* for the principle that legislative intent determines whether a provision in a criminal statute is an element of a crime or a sentencing enhancer, *id.* at ——, 118 *S.Ct.* at 1223, 140 *L.Ed.*2d at 358, and concluded after reviewing the statutory provisions at issue and their legislative history that "Congress intended

to set forth a sentencing factor in subsection (b)(2) and not a separate criminal offense." *Id.* at ——, 118 *S.Ct.* at 1226, 140 *L.Ed.*2d at 363.

Next, the Court addressed the doctrine of "constitutional doubt," relied on by the dissenting Justices to support their view that the statute should be construed in a manner that avoided grave doubts concerning its constitutionality. The majority opinion declined to apply the doctrine:

> That is because the "constitutional doubt" doctrine does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious. And precedent makes clear that the Court need not apply ... the doctrine in circumstances similar to those here—where a constitutional question, while lacking an obvious answer, does not lead a majority gravely to doubt that the statute is constitutional.
>
> [*Id.* at ——, 118 *S.Ct.* at 1227, 140 *L.Ed.*2d at 365.]

Finally, the Court rejected the contention that its emphasis in *McMillan* on the fact that the statute there did not "alter[ ] the maximum penalty for the crime," 477 *U.S.* at 87, 106 *S.Ct.* at 2417, 91 *L.Ed.*2d at 77, required a different result in *Almendarez–Torres* where the statute increased the maximum sentence tenfold. The Court emphasized that "the sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence." *Almendarez–Torres, supra,* 523 *U.S.* at ——, 118 *S.Ct.* at 1230, 140 *L.Ed.*2d at 368. In addition, the Court noted that the mandatory minimum sentence at issue in *McMillan* could be more disadvantageous to a criminal defendant than an increase in the maximum sentence because the former is binding on a sentencing judge whereas the latter is not. Accordingly, the Court rejected the contention that a statutory provision that increases the maximum permissible sentence necessarily constitutes an element of the crime. *Id.* at ——, 118 *S.Ct.* at 1231, 140 *L.Ed.*2d at 369–70.

Dissenting, Justice Scalia sharply criticized the majority's rejection of the "constitutional doubt" doctrine and its reliance on recidivism as a basis for distinguishing the concern expressed in

*McMillan* about statutes that increase the maximum permissible sentence: ·

But this parsing of various factors is really beside the point. No one can read our pre-*McMillan* cases, and especially *Mullaney* (whose limits were adverted to in *Patterson* but never precisely described) without entertaining a serious doubt as to whether the statute as interpreted by the Court in the present case is constitutional. And no one can read *McMillan,* our latest opinion on the point, without perceiving that the determinative element in our validation of the Pennsylvania statute was the fact that it merely limited the sentencing judge's discretion within the range of penalty already available, rather than substantially increasing the available sentence. And even more than that: No one can read *McMillan* without learning that the Court was open to the argument that the Constitution requires a fact which does increase the available sentence to be treated as an element of the crime (such an argument, it said, would have "at least . . . superficial appeal," 477 *U.S.,* at 88, 106 *S.Ct.,* at 2417). If all that were not enough, there must be added the fact that many State Supreme Courts have concluded that a prior conviction which increases maximum punishment must be treated as an element of the offense under either their state constitutions, or as a matter of common law.

In the end, the Court cannot credibly argue that the question whether a fact which increases maximum permissible punishment must be found by a jury beyond a reasonable doubt is an easy one. That, perhaps, is why the Court stresses, and stresses repeatedly, the limited subject matter that § 1326(b) addresses—recidivism. It even tries, with utter lack of logic, to limit its rejection of the fair reading of *McMillan* to recidivism cases. "For the reasons just given," it says, "and in light of the particular sentencing factor at issue in this case—recidivism—we should take McMillan's statement [regarding the "superficial appeal" the defendant's argument would have had if the factor at issue increased his maximum sentence] to mean no more than what it said, and therefore not to make a determinative difference here." *Ante* at 1231 (emphasis added). It is impossible to understand how *McMillan* could mean one thing in a later case where recidivism is at issue, and something else in a later case where some other sentencing factor is at issue. One might say, of course, that recidivism should be an exception to the general rule set forth in *McMillan*—but that more forthright characterization would display how doubtful the constitutional question is in light of our prior case law.

. . . .

What I have tried to establish—and all that I need to establish—is that on the basis of our jurisprudence to date, the answer to the constitutional question is not clear. It is the Court's burden, on the other hand, to establish that its constitutional answer shines forth clearly from our cases. That burden simply cannot be sustained. I think it beyond question that there was, until today's unnecessary resolution of the point, "serious doubt" whether the Constitution permits a defendant's sentencing exposure to be increased tenfold on the basis of a fact that is not charged, tried to a jury, and found beyond a reasonable doubt. If the Court wishes to abandon the doctrine of constitutional doubt, it should do so forthrightly, rather than by declaring certainty on a point that is clouded in doubt.

[*Id.* at ———-——, 118 *S.Ct.* at 1237–38, 140 *L.Ed.*2d at 376–79 (citations omitted).]

The Supreme Court again confronted the *Winship* issue this term in *Jones v. United States*, —— *U.S.* ——, 119 *S.Ct.* 1215, 143 *L.Ed.*2d 311 (1999). The issue in *Jones* involved the federal carjacking statute, 18 *U.S.C.A.* § 2119, and specifically considered whether the enhanced sentencing provisions of that statute should be treated as distinct offenses requiring inclusion in the indictment and proof of the criteria for enhanced sentencing beyond a reasonable doubt.

Jones and two accomplices held up two victims and stole their automobile. In the course of the carjacking one of Jones's accomplices stuck his gun in the left ear of one victim and then struck him on the head. Jones was apprehended when he crashed the stolen car into a telephone pole.

Jones and his accomplices were indicted for violation of the federal carjacking statute, 18 *U.S.C.A.* § 2119, which then read as follows:

> Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

Neither the indictment nor the District Court's jury instructions contained any reference to serious bodily injury or any facts relating to the victim's injuries. The jury convicted Jones of the carjacking offense and of aiding and abetting the use of a firearm in relation to a crime of violence. See 18 *U.S.C.A.* § 924(c).

The presentence report, however, recommended that Jones be sentenced to twenty-five years' imprisonment on the basis that one of the victims sustained a perforated eardrum and permanent hearing loss, constituting serious bodily injury for purposes of the carjacking statute. Jones objected, contending that serious bodily

injury was an element of the crime that had neither been charged in the indictment nor proved beyond a reasonable doubt to the jury. The District Court concluded that serious bodily injury was merely a sentencing factor and imposed a twenty-five-year sentence on the carjacking count on the basis that serious bodily injury was established by a preponderance of the evidence. The District Court also sentenced Jones to a consecutive five-year sentence for the firearm offense. The Ninth Circuit Court of Appeals affirmed, *United States v. Oliver*, 60 *F*.3d 547 (1995), but remanded for resentencing on other grounds.

In a 5–4 decision, the Supreme Court reversed, construing the statute to define three distinct offenses in reliance on the established rule that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." —— *U.S.* at ——, 119 *S.Ct.* at 1222, 143 *L.Ed.*2d at —— (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 *U.S.* 366, 408, 29 *S.Ct.* 527, 536, 53 *L.Ed.* 836, 849 (1909)). The Court first examined the structure of the carjacking statute and its legislative history, as well as comparable federal criminal statutes, and concluded on the basis of that examination that "Congress probably intended serious bodily injury to be an element defining an aggravated form of the crime." —— *U.S.* at ——, 119 *S.Ct.* at 1221, 143 *L.Ed.*2d at ——. The Court also reviewed the post-*Winship* decisional law, emphasizing the question raised in *McMillan* whether "judicial factfinding by a preponderance [may] support the application of a provision that increases the potential severity of the penalty for a variant of a given crime," as well as *"Mullaney* 's insistence that a State cannot manipulate its way out of *Winship,"* and *"Patterson* 's recognition of a limit on state authority to reallocate traditional burdens of proof." *Id.* at ——, 119 *S.Ct.* at 1224, 143 *L.Ed.*2d at ——.

Responding to the dissent's challenge to state with precision the principle underlying the majority's view that the carjacking stat-

ute, as applied by the District Court, may violate the Constitution, the Court explained:

> The preceding paragraph in the text expresses that principle plainly enough, and we re-state it here: under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. Because our prior cases suggest rather than establish this principle, our concern about the Government's reading of the statute rises only to the level of doubt, not certainty.
>
> [*Id.* at —— n. 6, 119 *S.Ct.* at 1224 n. 6, 143 *L.Ed.*2d at —— n. 6.]

Concurring, Justices Stevens and Scalia both expressed the belief that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at —— – ——, 119 *S.Ct.* at 1228, 143 *L.Ed.*2d at —— (Stevens, J., concurring).

Justice Kennedy, dissenting, expressed the view that the Court's holding in *Almendarez–Torres* was controlling notwithstanding that the sentencing factor implicated there was recidivism, and predicted that the Court's holding would have a significant impact on state sentencing statutes:

> [T]he Court is eager to find controlling significance in the fact that the statute at issue in *Almendarez–Torres* made recidivism a sentencing factor, while the sentencing factor at issue here is serious bodily injury. This is not a difference of constitutional dimension, and *Almendarez–Torres* does not say otherwise. It is true that our statutory analysis was informed in substantial measure by the fact that recidivism is a common sentencing factor. *Id.* at 230, 118 *S.Ct.* 1219. In our constitutional analysis we invoked the long history of using recidivism as a basis for increasing an offender's sentence to illustrate the novel and anomalous character of the petitioner's proposed constitutional rule—i.e., that under *McMillan v. Pennsylvania* any factor that increases the maximum penalty for a crime must be deemed an element of the offense. We proceeded to reject that rule. *Almendarez–Torres v. United States,* 523 *U.S.* at 247, 118 *S.Ct.* 1219.
>
> . . . .
>
> The rationale of the Court's constitutional doubt holding makes it difficult to predict the full consequences of today's holding, but it is likely that it will cause disruption and uncertainty in the sentencing systems of the States. Sentencing is one of the most difficult tasks in the enforcement of the criminal law. In seeking to bring more order and consistency to the process, some States have sought to move from a system of indeterminate sentencing or a grant of vast discretion to the trial judge to a regime in which there are more uniform penalties, prescribed by

the legislature. See A. Campbell, *Law of Sentencing* §§ 1:3, 4:6–4:8 (2d ed.1991). These States should not be confronted with an unexpected rule mandating that what were once factors bearing upon the sentence now must be treated as offense elements for determination by the jury. *This is especially so when, as here, what is at issue is not the conduct of the defendant, but the consequences of a completed criminal act.*

[*Id.* at ——, 119 *S.Ct.* at 1236–38, 143 *L.Ed.*2d at —— (emphasis added).]

## III

As the Court's opinion explains, *ante* at 12, 731 *A.*2d at 487, between the date of defendant's offenses and the date of his sentence the Legislature, in response to our decision in *State v. Mortimer,* 135 *N.J.* 517, 641 *A.*2d 257, *cert. denied,* 513 *U.S.* 970, 115 *S.Ct.* 440, 130 *L.Ed.*2d 351 (1994), amended *N.J.S.A.* 2C:44–3(e) to delete the words, "at least in part with ill will, hatred or bias toward the victim." *L.* 1995, *c.* 211. As amended, that statute provides in part:

2C:44–3   Criteria for sentence of extended term of imprisonment

The court shall, upon application of the prosecuting attorney, sentence a person who has been convicted of a crime ... to an extended term if it finds, by a preponderance of the evidence, the grounds in subsection e.

. . .

e.   The defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity.

The Appellate Division majority, in sustaining the constitutionality of *N.J.S.A.* 2C:44–3(e), concluded that defendant's purpose to intimidate the victims because of their race related only to his motive, not to his criminal intent, and therefore did not implicate an element of the crime. 304 *N.J.Super.* at 157–58, 698 *A.*2d 1265. The Court's opinion firmly rejects that distinction, acknowledging that "in ordinary circumstances proof of motive does not increase the penal consequences to an actor." *Ante* at 20, 731 *A.*2d at 492. The Court also observes that the 1995 amendment to the statute "limits our ability to view this finding as merely a search for motive. We must search for firmer principles of decision." *Ibid.*

The Court's acknowledgment that a defendant's alleged purpose to intimidate his victims because of their race involves not merely motive but an aspect of criminal intent serves to distinguish the issue in this appeal from those that most recently divided the United States Supreme Court in *Almendarez–Torres* and *Jones*. In *Almendarez–Torres*, the sentencing factor was recidivism, a factor unrelated to the defendant's purpose in committing the charged offense. In *Jones*, the sentencing factor at issue was whether serious bodily injury resulted from a carjacking, which also was unrelated to the defendant's intent in committing the underlying offense of carjacking. The significance of that distinction was emphasized by Justice Kennedy, writing for the four dissenters in *Jones*, who criticized the majority for treating "serious bodily injury" as an element of the offense: "This is especially so when, as here, what is at issue is not the conduct of the defendant, but the consequences of a completed act." *Jones, supra,* —— *U.S.* at ——, 119 *S.Ct.* at 1238, 143 *L.Ed.*2d at —— (Kennedy, J., dissenting).

Unlike *Almendarez–Torres* and *Jones*, the sentencing enhancement at issue here does involve the *conduct* of the defendant, as the definition of conduct in the Code of Criminal Justice (Code) makes clear: " 'Conduct' means an action or omission and its accompanying state of mind, or, where relevant, a series of acts and omissions." *N.J.S.A.* 2C:1–14(d). Directly related to the Code's definition of "conduct" is. its definition of "element of an offense":

"Element of an offense" means (1) such conduct or (2) such attendant circumstances or (3) such a result of conduct as

(a) Is included in the description of the forbidden conduct in the definition of the offense;

(b) Establishes the required kind of culpability;

(c) Negatives an excuse or justification for such conduct;

(d) Negatives a defense under the statute of limitations; or

(e) Establishes jurisdiction or venue.

[*N.J.S.A.* 2C:1–14(h).]

Our understanding of the Code's conception of an "element of an offense" also is informed by *N.J.S.A.* 2C:2–2, entitled "General requirements of culpability." That provision states generally that "a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." *N.J.S.A.* 2C:2–2(a). The Code defines purposely, the state of mind referred to in *N.J.S.A.* 2C:44–3(e), as follows: "A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result." *N.J.S.A.* 2C:2–2(b)(1).

As the Supreme Court emphasized in *Mullaney, supra,* the due process protections afforded by the Court's holding in *Winship* cannot be undermined by states redefining the elements of crimes and characterizing essential factors as bearing only on sentencing. *Mullaney, supra,* 421 *U.S.* at 698–99, 95 *S.Ct.* at 1889–90, 44 *L.Ed.*2d at 519–20. Accordingly, although defendant pled guilty to the second-degree crime of possession of a firearm for the purpose of using it unlawfully, *N.J.S.A.* 2C:39–4(a), pursuant to *N.J.S.A.* 2C:44–3(e) he was subject to sentencing as a first-degree offender if he committed that offense with a purpose to intimidate the victims because of their race. Under the Code, defendant would have acted "purposely" if his conscious object in possessing and using the firearm was to intimidate the victims because of their race. *N.J.S.A.* 2C:2–2(b)(1). Such conduct, combined with defendant's purposeful state of mind, would constitute an element of the offense if it "establishe[d] the required kind of culpability." *N.J.S.A.* 2C:1–14(h)(b). As the dissenting judge observed below, *N.J.S.A.* 2C:44–3(e) requires proof of a purpose to intimidate because of race in order to "establish[ ] the required kind of culpability." 304 *N.J.Super.* at 165, 698 *A.*2d 1265 (Wecker, J., dissenting). In my view, a fair reading of the Code's conception of an element of an offense demonstrates that conduct, accompanied by a purpose to intimidate because of race, embodies those characteristics that qualify unmistakably as an "element of an offense," and therefore is subject to the Code's mandate that "[n]o

person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt." *N.J.S.A.* 2C:1–13(a).

The foregoing statutory analysis demonstrates that the Legislature's inclusion of a preponderance-of-the-evidence standard of proof in *N.J.S.A.* 2C:44–3(e) is structurally inconsistent with those basic provisions of the Code that define conduct, mental states, and elements of an offense. As a matter of statutory interpretation, I would invalidate *N.J.S.A.* 2C:44–3(e) to the extent that it purports to treat a defendant's purpose to intimidate because of race as a sentencing enhancement rather than as an element of an offense.

I also conclude that *N.J.S.A.* 2C:44–3(e) is unconstitutional under the Due Process Clause of the Fifth Amendment, and under the Sixth Amendment's notice and jury trial guarantees, based on the United States Supreme Court decision in *Winship, supra,* and its progeny, and that it violates as well Article 1, Paragraph 1 of the New Jersey Constitution. See *Greenberg v. Kimmelman,* 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985) (noting that Article 1, Paragraph 1 of New Jersey Constitution encompasses principles of due process and equal protection). The Supreme Court's jurisprudence on the *Winship* issue reflects the sharp divisions on that Court and the absence of a clear standard limiting the power of legislative bodies to delegate to a sentencing judge under a preponderance-of-the-evidence standard the determination of whether a sentencing enhancement factor has been established. Notwithstanding the analytical tensions and imprecision reflected by the Supreme Court precedents, there can be little doubt that the sentencing factor applied to this defendant—the purpose to intimidate a victim because of race—must fairly be regarded as an element of the crime requiring inclusion in the indictment and proof beyond a reasonable doubt. *N.J.S.A.* 2C:44–3(e) permits the sentencing judge, based on the statutory sentencing factor, to sentence a defendant as if the crime committed were one degree higher, potentially doubling the sentencing exposure for many

defendants and, in the case of a first-degree offender, increasing that defendant's exposure from a ten-to-twenty-year range to life imprisonment. The Court expressly declines to decide whether that enhancement would offend due process, *ante* at 27 n.3, 731 *A.*2d at 496 n.3, but its reluctance to approve that level of enhancement demonstrates its discomfort with the concept that a critical determination of an aspect of culpability materially affecting a defendant's term of imprisonment would not be found by a jury beyond a reasonable doubt. Unquestionably, the sentencing enhancement authorized by *N.J.S.A.* 2C:44–3(e) meets the standard of the constitutional principle that induced the Supreme Court to reverse in the *Jones* case. See *Jones, supra,* —— *U.S.* at —— n. 6, 119 *S.Ct.* at 1224 n. 6, 143 *L.Ed.*2d at —— n. 6.

The Court's opinion attempts to reconcile *N.J.S.A.* 2C:44–3(e) with the Supreme Court precedents by analogizing defendant's biased purpose to recidivism:

> [T]he Legislature simply took one factor that has always been considered by sentencing courts to bear on punishment and dictated the weight to be given that factor. A finding of a biased motive or purpose to intimidate, like the factor of recidivism in the *Almendarez–Torres* analysis, is a very traditional sentencing factor.
>
> [*Ante* at 24, 731 *A.*2d at 494–95.]

The difference, however, is glaring. The factor of recidivism is readily determined on the basis of the official court record of a prior conviction; it involves no inquiry into the defendant's conduct in perpetrating the current offense; and recidivism, of course, involves no inquiry in connection with the defendant's mental state in committing the current offense. Neither the *Jones* case, in which the sentencing factor was serious bodily injury to a carjacking victim, nor *McMillan,* in which the sentencing factor was visible possession of a firearm in the course of committing various felonies, required the sentencer to make findings of fact, such as are required by *N.J.S.A.* 2C:44–3(e), about the mental state of a defendant when he committed the subject offense. Because under our Code a finding that a defendant possessed the requisite mental state is indispensable to a conviction, *N.J.S.A.* 2C:2–2, there simply can be no doubt that defen-

dant's purpose to intimidate these victims because of their race must be regarded as a material element of the charged offenses.

The Court correctly cautions that if a defendant's purpose to intimidate based on race were an element of his criminal offense, that could "create[ ] an added risk of prejudice for defendants. It would open trials to evidence of former acts of bias on the part of the actor." *Ante* at 26, 731 *A*.2d at 495. That concern is a significant one and undoubtedly could be addressed by implementing a variant of the procedure we followed in *State v. Ragland,* 101 *N.J.* 33, 499 *A*.2d 1366 (1985), *reconsidered,* 105 *N.J.* 189, 519 *A*.2d 1361 (1986). The defendant in *Ragland* was charged with unlawful possession of a weapon and possession of a weapon by a convicted felon. We held that the "two charges must be tried separately since proof that defendant was a convicted felon (required in the trial of the latter charge) clearly tends to prejudice the jury in considering the former." 105 *N.J.* at 193, 519 *A*.2d 1361. That procedure was followed in *Ragland* using the same jury. That jury first tried the unlawful possession charge and then tried the charge of possession by a convicted felon. *Id.* at 195, 519 *A*.2d 1361. That procedure could be adapted to the charges against defendant, resulting in the same jury first trying the possession offenses and subsequently deliberating on the charge that the possessory offenses were committed with a purpose to intimidate the victims because of their race.

## IV

The principle that fortifies my conclusion that defendant's convictions and sentence must be reversed because of the unconstitutionality of *N.J.S.A.* 2C:44–3(e) was simply and eloquently expressed by Justice Brennan in *Winship* and bears repetition here:

> Moreover, use of the reasonable-doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law. It is critical that the moral force of the criminal law not be diluted by a standard of proof that leaves people in doubt whether innocent men are being condemned....

> [*In re Winship, supra,* 397 *U.S.* at 364, 90 *S.Ct.* at 1072–73, 25 *L.Ed.*2d at 375.]

Accordingly, I would reverse the judgment of the Appellate Division and remand the matter for a new trial consistent with this opinion.

HANDLER, J., joins in this opinion.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*For reversal and remandment*—Justices HANDLER and STEIN—2.